THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS FOX, Defendant-Appellant.

First District (1st Division)   No. 86—0127

Opinion filed December 19, 1988.

Steven Clark and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry and James E. Fitzgerald, Assistant State's Attorneys, and Kathleen F. Howlett, Special Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Dennis Fox, was convicted of murder and two counts of armed robbery and was sentenced to concurrent terms of natural life and 30 years' imprisonment. Defendant appeals. On appeal, defendant contends (1) the trial court's refusal to ask certain *voir dire* questions requested by defense counsel constitutes error; (2) the trial court erred in restricting the cross-examination of an accomplice witness as to bias; (3) the State's failure to timely disclose the identity of a rebuttal witness denied defendant a

fair trial; (4) the trial court abused its discretion in permitting the State to impeach defendant's testimony by admitting evidence of defendant's prior convictions; (5) the trial court improperly admitted testimony that defendant had violated his probation on a prior burglary conviction, that one of his prior convictions had been reduced from a greater charge, and as to the sentences received by defendant; (6) that he did not receive a fair trial where the trial court held one of his attorneys in contempt in the presence of the jury; (7) the trial court erred by instructing the jury before closing arguments of counsel; and (8) it is necessary to remand this cause for a hearing on whether the State exercised its peremptory challenges in a racially discriminatory manner.

At trial, Hardy Taylor testified that his brother, Elijah Taylor, was the owner and proprietor of the Impala Lounge in Chicago. He worked part time for his brother at the lounge. On the morning of December 18, 1984, he testified that he left the lounge at 2:45 a.m. When he arrived home, his wife and daughter told him that Elijah had been shot. When he reached the hospital, he was informed that his brother was dead.

Ruby Terrell, Elijah Taylor's girlfriend, testified that she was a part-time employee at the Impala Lounge and also worked as a barmaid at the Dynasty Lounge. Terrell stated that Elijah Taylor was also known by the name of Peter. She testified that on December 18, 1984, she finished work at the Dynasty Lounge at about 2 a.m. and went to the Impala Lounge. After dropping two friends off, she waited for Elijah Taylor in his car in front of the lounge. When he came out of the lounge, Taylor was carrying a brown paper bag containing a dozen eggs and sausage and they drove to Taylor's home, where they intended to cook breakfast. She stated that when they reached Taylor's building, she followed Taylor through the building's first door, which did not require a key, into the vestibule. As Taylor unlocked a second door, which led to a stairway, she heard a noise and returned to the first door to close it. Before she could close the door, she saw a man standing in the doorway with a long-barrelled pistol and he shot Elijah Taylor. Terrell identified defendant in court as the gunman. After the defendant shot Taylor, he told Taylor to give him the money and the two struggled first on the stairway and then in the vestibule. Taylor responded that he had no money. The defendant called for someone to help him. A second man appeared and they both wrestled Taylor to the ground. The defendant told the second man to get Taylor's wallet and coat. Before the two men left, the defendant pulled a chain off Terrell's neck and took her coat and purse. Thereaf-

ter, the two men fled. Elijah Taylor died later that day of a gunshot wound to the abdomen. Subsequently, Terrell identified defendant in a lineup.

Robert Young, Elijah Taylor's neighbor, testified that after he heard loud talking and a chain hitting the ground across the street, he looked out his window and saw two men running across his lawn. He heard a car door slam and an engine start from the rear of his house. Young stated that one man was tall and was wearing a blue jacket, a red scarf on his neck and white sneakers. The other man was short and had white shoes on.

Kenneth Walls, a codefendant, testified pursuant to a plea agreement with the State under which the murder charge against him would be dropped and the State would recommend concurrent 10-year sentences on the armed robberies in this case and in another case. He testified that on the evening of December 17, 1984, he was drinking and taking narcotics. At about 1:30 a.m. he drove his uncle's car to a restaurant with the defendant, Keith Coleman and Nathan Haley. The restaurant was located across from the Impala Lounge. As the four men ate in the car, Coleman said that the lounge across the street was Pete's lounge and that Pete kept money on him and they should rob him. Coleman was a regular patron of the Impala Lounge and Walls had been there previously with him. Coleman walked over to the lounge, ostensibly to buy cigarettes, and returned and informed the others that the lounge was about to close. As Walls and the others were sitting in the restaurant parking lot, they observed Pete's car drive away and return about 15 minutes later. Walls testified that Elijah Taylor then came out of the lounge carrying a brown paper bag. Coleman identified the man as "Pete" and said there might be money in the bag. Defendant suggested that they follow the car. Defendant asked Haley to go with him to rob Taylor. As defendant and Haley got out of the car, Walls saw the handle of a gun inside defendant's pants.

Walls further testified that defendant and Haley ran between two buildings, stopped for a few seconds, and then ran out of sight. After a few minutes, Walls heard a woman screaming. A minute later defendant and Haley returned to the car and defendant had a gun in his right hand and a beige coat wrapped around his arm. Haley was carrying a woman's purse. Walls drove off quickly at defendant's instruction. Walls testified that while he was driving, defendant and Haley went through the contents of Ruby Terrell's purse and Taylor's wallet but found no money. Walls testified that defendant was wearing a black leather jacket, black pants and white gym shoes. Haley was

wearing a light blue down coat, a maroon scarf and a black and white sweater, black pants and white shoes.

On behalf of the defendant, his cousin, Lacquette Ford, testified. She stated that during December 1984, she was staying at defendant's apartment along with Michael Williams. On December 17, 1984, she and defendant had given a birthday party for a friend named Rhonda. The guests began arriving at 8 p.m. and included Kenneth Walls and Keith Coleman. Defendant was wearing dress pants, a sweater and dress shoes. Between 9 p.m. and 10 p.m. Ford received a telephone call informing her that her mother was ill. She left the party and returned at 2 a.m. or 2:30 a.m. The party was still in progress and defendant was at the apartment. Coleman and Walls had left. Ford went to bed at 4 a.m., at which time defendant was already asleep on the couch. Ford testified that defendant did not leave the apartment between the time she returned and the time she went to bed.

Michael Williams testified that in December 1984 he was staying at the apartment of defendant, whom he had met through his friend Nathan Haley. On December 17, 1984, they gave a birthday party for Rhonda Gloss. The guests included Lacquette Ford, Kenneth Walls, Nathan Haley, Keith Coleman and others. Williams remained at the party until 1:30 a.m. and left the party to see his mother. Williams returned to the party at 2 a.m., at which time defendant was still at the party. Williams testified that defendant did not leave the apartment before going to sleep at 3:30 a.m. while Williams was still awake and cleaning up from the party.

Defendant testified on his own behalf and stated that he was not involved in the crime. On December 18, 1984, defendant stated that he was not wearing a leather jacket or gym shoes but was wearing gray dress pants which were not dark. He did not remember what Haley was wearing at the party, except that he was wearing white shoes which looked like gym shoes.

Billie Fortino, an investigator from the State's Attorney's office, testified as a rebuttal witness for the State. She stated that she interviewed Lacquette Ford on September 26, 1985, and Ford told her that she went to sleep at 2:15 a.m. on the night of the incident and she did not see anyone else after that time. Fortino further stated that she had a conversation with Michael Williams and Williams stated that he did not want to be interviewed because he did not want to say anything that would hurt defendant in court.

■ Defendant first argues that the trial court committed error when it refused to ask three *voir dire* questions requested by defense

counsel concerning the State's burden of proof, the defendant's right to remain silent and the presumption of innocence. As authority for this argument, defendant relies on *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062, where the court held that the failure to ask three *voir dire* questions governing the same areas constituted error since "[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury." (103 Ill. 2d at 477, 469 N.E.2d at 1065.) The court further stated that a jury instruction at the end of the trial would have little curative effect if a juror were prejudiced against one of those basic guarantees. The State contends that the trial judge here fulfilled the *Zehr* requirements by remarks he made at the outset of *voir dire*.

Upon our examination of the *voir dire* proceedings conducted in this case, it is our opinion that the concerns expressed by the *Zehr* court were adequately dealt with here. We note that the entire venire was in the courtroom during the *voir dire* of the various panels. The trial judge addressed the entire venire en masse extensively in a very clear and articulate manner before any questions were presented to them. As to the State's duty to prove the defendant guilty beyond a reasonable doubt, the trial judge said:

"The burden of proof will rest upon those who bring the charge to prove these charges to you by legally competent evidence which will convince you, the jury, beyond a reasonable doubt of the guilt of Mr. Fox of any or all of these charges that have been placed against him. That burden is borne by the State's Attorney of Cook County. The State brings the charges, or the prosecutors bring the charges, rather, and therefore they are faced with the burden of convincing you, the jury, that Mr. Dennis Fox has committed one or more of these acts, these crimes that they charged him with, by legally sufficient evidence which convinces you of that fact beyond a reasonable doubt. If at the conclusion of all the evidence that is going to be presented to you in this courtroom you are convinced beyond a reasonable doubt by that evidence, by all of it, that the defendant, Dennis Fox, has been proven guilty beyond a reasonable doubt of the offenses of murder and armed robbery, it will be your responsibility to enter a finding of guilty as to those charges. If you are not convinced that the defendant has been proven guilty beyond a reasonable doubt by all of the evidence of the offenses of murder or armed robbery or both, then it will be your responsibility to enter verdicts of not guilty. You

must maintain an open mind \*\*\* the burden of proving this case will always rest upon the prosecution \*\*\* Mr. Dennis Fox doesn't bear any burden in this case of proving his innocence of any of the charges that have been presented, that have been read to you, so Dennis Fox will bear no burden at all in this case to prove his innocence. The burden will always rest on the prosecution's side of the table to prove his guilt to your satisfaction beyond a reasonable doubt."

Concerning defendant's right to remain silent, the court told the prospective jurors:

"If he chooses to stay silent and mute as he is now throughout the course of this case, then you can't use that silence or his muteness as being any evidence of his guilt. However, if he does testify, or he does present evidence or witnesses in this case, then you will judge his testimony and his evidence by the same standard as to believability which you will use to judge the believability of any other witness in this case, but until such time as that time comes, if that time ever comes about, if he takes the stand or presents witnesses or evidence, then you must give him the right that the law says you are not to use his silence or his muteness as being any evidence that he is saying to you by that he is guilty of any of these offense that have been placed against him. You can't adopt the attitude that if you were in his place, that if you were innocent, that you would avail yourself of the opportunity to stand up at your first time in court and say 'I'm not guilty and I didn't do this offense.' "

As to the presumption of innocence of the defendant, the trial judge stated:

"Our law also says that he, as he sits before you now and throughout the course of this trial and until you have heard all of the evidence that is going to be presented here in this case, each one of you must look at Dennis Fox and presume him to be innocent of all the charges that have been placed against him. This is a presumption that stays with him \*\*\* and this presumption is only overcome from all of the evidence in this case convincing you of his guilt beyond a reasonable doubt of the offenses of murder or armed robbery. And until such time as that point arises in your mind and after you have heard all of the evidence, then each one of you must give to Dennis Fox the presumption of innocence that the law says he is entitled to have."

From our review of these extensive remarks by the trial judge prior

to individual questioning of jurors, we find the holding of *Zehr* was satisfied. Further, during individual questioning the trial judge asked each juror whether he had any quarrel with any principle of law which he would be required to follow, and throughout interrogation the trial judge reiterated the *Zehr* concerns. The *Zehr* court specifically indicated that the exact questions which were at issue in that case need not be asked, but rather the subject matter should be probed during *voir dire*. Subsequently, in *People v. Emerson* (1987), 122 Ill. 2d 411, the supreme court held that *Zehr* did not attempt to prescribe a precise formula for a trial judge to use in ascertaining jurors' prejudices or attitudes, and that the purposes expressed in *Zehr* were satisfied by the trial judge's general admonitions coupled with his subsequent discussion. On this record, we conclude that the trial judge sufficiently complied with *Zehr*. See also *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 496 N.E.2d 1157.

Defendant next contends that the trial court erred in restricting the cross-examination of the accomplice witness, Kenneth Walls. Specifically, during the cross-examination of Walls, defense counsel asked him whether he expected to receive a 10-year sentence under the terms of a plea agreement with the State. At that point the trial judge interjected that Walls had no expectation of a particular sentence because the sentencing court was not bound by the State's recommendation. The trial court had interjected a similar comment when the State made the same query during direct examination. Further, the trial judge refused to permit defense counsel to examine Walls regarding what sentence he knew he could have received for murder or to allow questions as to when Walls expected to be released from prison. The trial judge advised defense counsel that the State may recommend a sentence, but the court imposes it. The court further stated that an appropriate inquiry of defendant would be what he expects the State to recommend as a sentence.

We recognize the right of a criminal defendant to cross-examine the witnesses against him as a constitutionally protected right, and one important function of cross-examination is the exposure of a witness' motivation for testifying. (*People v. Eddington* (1979), 77 Ill. 2d 41, 394 N.E.2d 1185; *People v. Foley* (1982), 109 Ill. App. 3d 1010, 441 N.E.2d 655.) The right to confrontation, however, does not prevent a trial judge from imposing limits on defense counsel's inquiry into potential bias of a prosecution witness. Cross-examination for the purpose of establishing bias, motive or interest on the part of a witness is a matter of right subject to the trial court's broad discretion to confine cross-examination to proper subject matter. (*Foley*, 109 Ill.

App. 3d 1010, 441 N.E.2d 655; *People v. Phillips* (1981), 95 Ill. App. 3d 1013, 420 N.E.2d 837.) A review of Wall's testimony at trial reveals that on cross-examination, as well as direct examination, he testified that he entered into a plea agreement with the State whereby, in exchange for his testimony at trial, if he pled guilty to two counts of armed robbery, the murder charge would be dropped and the State would recommend 10 years' imprisonment. From our review of this testimony, we find it sufficient to expose Walls' motivation for testifying.

Defendant further argues that the State failed to timely disclose the identity of a rebuttal witness. During the State's cross-examination of defense witnesses Lacquette Ford and Michael Williams, the State questioned them regarding prior statements they had made to a State's Attorney investigator, Billie Fortino. Defendant contends that this was the first notice afforded defense counsel that Fortino would be a witness in violation of the rules of discovery. Both Ford and Williams gave alibi testimony on defendant's behalf. Fortino testified that the testimony provided by the two defense alibi witnesses was inconsistent with prior statements the witnesses had made to her. The trial court denied defendant's motion for a mistrial on the ground that the State had not intentionally withheld Fortino's name from its list of witnesses.

■■ ■ The rules of discovery require the State to disclose to a defendant the names of those persons whom it intends to call as witnesses. (107 Ill. 2d R. 412(a).) Until the State forms an intent to call the witness, however, disclosure is not required. (*People v. Hine* (1980), 89 Ill. App. 3d 266, 411 N.E.2d 930; *People v. Manley* (1974), 19 Ill. App. 3d 365, 311 N.E.2d 593.) We agree here with the State's position that its intent to call Fortino to testify was most probably formed only at the time that the two defense alibi witnesses testified inconsistently with the prior statements which they had provided Fortino. Since we find that there is no evidence of blatant bad faith on the part of the State, we find no abuse by the trial court in allowing Fortino's testimony. *Cf. People v. Jarrett* (1974), 22 Ill. App. 3d 61, 316 N.E.2d 659.

■■ Defendant's next contention is that the trial court improperly admitted evidence of his prior convictions for aggravated battery and robbery for impeachment purposes. He argues that this ruling was an abuse of discretion as set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, since the prejudicial effect of the evidence substantially outweighed any probative value of the convictions. While the general rule is that evidence of past crimes is not

admissible to prove defendant's disposition to commit the crimes charged (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200), evidence of other crimes may be admitted if they are relevant to establish any material question other than the propensity of the defendant to commit a crime. (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.) Under the principles of *Montgomery*, where the prior convictions were for a felony or crimes involving dishonesty, they are admissible for impeachment if the crimes were punishable by imprisonment in excess of one year and were committed within 10 years of the crime for which the defendant is now charged. The *Montgomery* court stated that "the experienced trial judge has a sensitivity in this regard which normally can be relied upon to strike a reasonable balance between the interests of the defendant and of the public." (47 Ill. 2d 510, 518, 268 N.E.2d 695, 698.) Factors which may be considered by the trial court in exercising its discretion are the nature of the crime, nearness or remoteness, the subsequent career of the defendant and whether the crime was similar to the one charged. (*People v. Patterson* (1980), 88 Ill. App. 3d 168, 410 N.E.2d 396.) Contrary to defendant's contention, prior convictions for crimes which are the same crimes with which the defendant is now charged do not mean that they cannot be introduced as evidence. *People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336.

In the case at bar, we find no violation of the *Montgomery* principles and it is our opinion that the admission of defendant's prior convictions was sufficiently probative as to his credibility to outweigh any prejudice and, accordingly, the prior convictions were properly admitted for impeachment purposes. Furthermore, the jury was given a limiting instruction as to the evidence of other crimes which substantially reduced any prejudical impact which may have resulted by virtue of the admission of this evidence. *People v. Kirkwood* (1980), 82 Ill. App. 3d 252, 402 N.E.2d 677.

Defendant further argues that the court erred in allowing the State in rebuttal argument to read certified copies of three of defendant's prior convictions into the record. Defendant contends that this method of impeachment was prejudicial to defendant because the State informed the jury what sentences he received, that one of the convictions had been reduced from a greater charge and that his probation on another conviction had been violated.

We do not accept defendant's contention. The burden to demonstrate prejudice resulting from admission of evidence of prior convictions is on the defendant. (*People v. Perez* (1981), 98 Ill. App. 3d 64, 423 N.E.2d 964.) In reading from the certified copies of the

convictions, the State did not describe the circumstances of the crimes or wrongful acts in any detail, but simply listed the offenses on defendant's record. Under these circumstances, although this evidence should not have been admitted, it is our holding that it was not sufficiently prejudicial as to warrant reversal in light of the overwhelming evidence against defendant. *People v. Lyden* (1981), 97 Ill. App. 3d 540, 423 N.E.2d 262.

■■ Defendant next contends that he did not receive a fair trial where the trial court held one of his attorneys, Donald Bertelle, in criminal contempt of court in the presence of the jury. Subsequently, this court reversed the judgment for contempt. (*People v. Bertelle* (1987), 164 Ill. App. 3d 831, 518 N.E.2d 332.) The finding of contempt followed a colloquy where the court twice sustained objections to Bertelle's line of questioning and Bertelle responded that the court's ruling was "unfair." Thereafter, the court admonished the jury as follows:

> "Ladies and gentlemen, a few moments ago you heard the court in very positive, angry terms have a colloquy between the court and Mr. Bertelle in this matter. There is nothing personal in that display of anger or the colloquy that the court had between itself and Mr. Bertelle. Certainly that colloquy cannot be used by you as being any evidence of Mr. Bertelle's client's guilt or innocence in this case. You are to disregard it and not accept any part of that colloquy as being evidence. You will take it for what it was—a statement from the court as to what was acceptable and what was not acceptable by a lawyer in a trial of a case—that and nothing more. Of course, there is no personal animosity that exists between Mr. Bertelle and me on that account."

We recognize that disparaging remarks directed at defense counsel must be made with great caution or they may be prejudicial error. (*People v. Pressley* (1987), 160 Ill. App. 3d 858, 513 N.E.2d 921.) In the case at bar, however, we do not believe the disparaging exchanges between defense counsel and the trial judge were so numerous or were of such a magnitude as to constitute reversible error. In our judgment, the trial court's strong admonishment to the jury to disregard the colloquy between Bertelle and the court and not to consider it as evidence against the defendant obviated any prejudicial effect. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188.) For these reasons, defendant cannot prevail on this claim.

■■ Defendant further argues that the trial court erred by in-

structing the jury prior to closing argument of counsel rather than after closing arguments as provided by the Illinois Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(i).) The trial judge stated his rationale for his actions:

"[G]iving the jury the instruction prior to argument leads to a better understanding by the jury of all the issues that have been presented in the case and will also permit counsel to argue the Court's instruction as to the law in their final argument without the necessity of needless objections on the part of counsel when they do comment on the law [that they] are invading the province of the Court in talking about the law."

We have reviewed the authorities cited by defendant for his position (*People v. Kent* (1976), 40 Ill. App. 3d 256, 350 N.E.2d 890 (in a fraud case the trial court's failure to instruct the jury that an element of proof was that a delivered document was capable of defrauding another was held harmless error); *Kinser v. Kruse* (1972), 4 Ill. App. 3d 987, 283 N.E.2d 120 (the court found reversible error in the trial judge's hurried and unintelligible reading of the instructions to the jury)) and find them inapplicable to the procedural question before us. While we believe the better approach would be to follow the guidelines of the statute which provides for the trial judge to instruct the jury after the closing arguments of counsel, we cannot say the procedural error here rises to such a level as to require reversal. The record reveals that the able trial judge delivered the instruction to the jury in a clear, accurate and complete manner. While he deviated from established trial court practice, we find no error in the manner in which he delivered the instructions.

Finally, defendant contends that this case must be remanded for a hearing under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, to determine whether the prosecutor used his peremptory challenges to exclude blacks from the jury merely because of their race. The *Batson* court held that prosecutors may not purposefully discriminate against a racial group in selecting a jury in a trial of a defendant belonging to that group. To establish a *prima facie* case of discrimination, a defendant must demonstrate that he is a member of a recognizable group and that the prosecutor used peremptory challenges to remove members of his race from the jury panel. The defendant must show that the relevant facts and circumstances of the case raise an inference of discrimination.

From our review of this record, we do not believe the defendant has met his burden of raising the inference of purposeful discrimination. The prosecutor noted for the record that four blacks

were sitting on the jury. We find no evidence that the prosecutor set out to keep blacks off the jury or that anything other than racially neutral criteria was used to qualify venire members. Accordingly, defendant has not established a *prima facie* case to remand this case for a *Batson* hearing.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY and O'CONNOR, JJ., concur.